**"Redacted Version"**

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

No. 08-456C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

DCMS-ISA, INC., L&R SECURITY FORCES, INC. (INTEGRATED SECURITY FORCES, INC.); THE WHITESTONE GROUP, INC.; AND R&D TRAINING AND TECHNICAL SERVICES (RDTTS)

Plaintiff,

v.

THE UNITED STATES,

Defendant,

---

# PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (BID PROTEST)

---

William L. Bruckner
Bruckner & Walker
4550 Kearny Villa Road, Suite 209
San Diego, CA 92123
Telephone (858) 565-8300
Facsimile (858) 565-0813

Attorney for Plaintiff

**"Redacted Version"**

UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

**"Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order"**

| | |
|---|---|
| DCMS-ISA, Inc., L&R Security Forces, Inc. (Integrated Security Forces, Inc.); The Whitestone Group, Inc.; and R&D Training and Technical Services (RDTTS)<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, Department of Homeland Security<br><br>Defendant. | USCFC No. 08-456C<br><br>Judge Nancy B. Firestone<br><br>**PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (BID PROTEST)** |

Pursuant to RUSCFC 52.1, PLAINTIFFS Service-Disabled Veteran-Owned Small Businesses ("SDVOSB" or "PLAINTIFFS") respectfully submit the following Motion for Judgment on the Administrative Record. PLAINTIFFS' Motion is supported by the Complaint, the Administrative Record (the "AR"), PLAINTIFFS' Statement of Fact.

## I.

## STATEMENT OF THE ISSUES

The issues before the Court are as follows:

On or about February 19, 2008, the Department of Homeland Security ("DHS") issued Solicitation HSCEW8-08-R-00004 requesting proposals for Colorado Armed Guard Services (the "SOLICITATION"). The SOLICITATION was a competitive set-aside for a Service-Disabled Veteran-Owned Business ('SDVOSB") in accordance with 48 C.F.R. 52-219-27. The SOLICITATION was for armed guard services for 50 buildings across 10 cities in the Denver, Colorado area on a recurring basis.

DHS received 14 separate SDVOSB proposals (13 of which were rated by the DHS team) and rejected all proposals on the basis that, of the 13 SDVOSB, no single SDVOSB had relevant past performance experience.

DHS' decision to reject all SDVOSB proposals on the basis that no single proposal of 13 SDOVSB proposals submitted had the required relevant past performance experience and to cancel the SOLICITATION for that sole reason was arbitrary, capricious and lacked a rational basis. The decision was also a clear violation of numerous clauses in the Code of Federal Regulations ( the "CFR").

Each PLAINTIFF'S proposal included a "teaming arrangement" with other entities, all of which have substantial relevant past performance experience in meeting the requirements of this SOLICITATION. DHS' refusal to consider the relevant past performance experience of any of the SDVOSB teams was arbitrary, capricious and lacked a rational basis. The decision was also a clear violation of numerous clauses in the Code of Federal Regulations (the "CFR").

The SOLICITATION did not include a description of the approach for evaluating past performance, including evaluating offerors with no relevant performance history. DHS' decision to reject all SDVOSB proposals on the basis that no single proposal of the 13 SDVOSB proposals submitted had the required relevant past performance experience and to cancel the SOLICITATION for that sole reason was arbitrary, capricious and lacked a rational basis. The decision was also a clear violation of numerous clauses in the Code of Federal Regulations (the "CFR").

In substantial part, the focus of this Motion is the rating factor of "Past Performance" as the DHS cancelled the SOLICITATION on the basis of its concerns over this factor and this factor alone.

Since the DHS cancelled the SOLICITATION by ignoring the requirements of the CFR on the issue of past performance, no reasonable basis exists to reject all proposals and cancel the SOLICITATION.

As the issue of past performance is an issue of responsibility, only the SBA has the statutory authority to determine whether each individual has sufficient past performance or is competent to receive the SOLICITATION.

## II.
## <u>STATEMENT OF THE FACTS</u>

1. On or about February 19, 2008, the Department of Homeland Security ("DHS") issued Solicitation HSCEW8-08-R-00004 requesting proposals for Colorado Armed Guard Services (the "SOLICITATION"). The SOLICITATION was a competitive set-aside for a Service-Disabled Veteran-Owned Businesses ('SDVOSB") in accordance with 48 C.F.R. 52-219-27. The SOLICITATION was for armed guard services for 50 buildings across 10 cities in the Denver, Colorado area on a recurring basis. *Administrative Record ("AR") pp 7-170.*

2. On or about June 7, 2007, the DHS developed an acquisition plan to set aside the Reacquisition of Region 8 Guard Services for SDVOSB. *AR pp 1-2.*

3. Sometime between June 7, 2007 and February 19, 2008, the DHS conducted MARKET RESEARCH FOR REGION 8-REACQUISITION OF GUARD SERVICES ("MR") and concluded "…the Government has significant confidence that a SDVOSB contractor can be found that will be able to successfully perform all the requirements of this procurement." More than 40 SDVOSB contractors responded to the Request for Information/Sources Sought ("RFI"). *AR pp 3-6.*

4. The MR concluded that for at least five (5) companies "..the Government has confidence that …..would be able to successfully perform the requirements of this procurement." . *AR pp 3-6.*

5. The Contracting Officer for the MR was Ed Paker. *AR pp 3-6.*

6. Of the five (5) companies that the DHS determined "…the Government has significant confidence that a SDVOSB contractor can be found that will be able to successfully perform all the requirements of this procurement," at least three submitted timely proposals. *AR pp 570-657, 658-730 and 1200-1266.*

7. On February 27, 2008, the DHS issued Amendment 00001. Amendment 00001 provided to all interested offerors questions and answers ("Q&A's"), added a new Section L and changed the date for the receipt of offers. *AR pp 171-188.*

8. Q&A 1) states that a teaming agreement with an SDVOSB having 51% management control is satisfactory for this requirement as long as the teaming arrangement complies with 48 C.F.R..§ 52.219-27 and 48 C.F.R. § 52.212-3. *AR p 86.*

*9.* Q&A (2) required the teaming agreement to be a part of the proposal. *AR p 173.*

10. Q&A (4) states that the "organization, financial capability, experience, accounting control and technical skills of the teaming partner will suffice if the SDVOSB is less experienced." *AR pp 173.*

11. Q&A (1) required both the prime and partner to submit past performance limiting the submission to three from each of the prime and partner. *AR p 175.*

12. Amendment 00002 provided revised Sections B, L and M to all prospective offerors. Section L included the instruction for submitting the proposal and a past performance questionnaire. Section M stated the Evaluation Factors and the basis for award. Technical and Past Performance factors are equal in importance, and when combined, are significantly more important than price. The criteria states that these factors will be used to evaluate proposals. *AR pp 189-202.*

13. 48 C.F.R. 15.305 provides mandatory guidance to government agencies evaluating proposals. 48 C.F.R. 15.305 (2) states:

> (2) Past performance evaluation.
>
> (i) Past performance information is one indicator of an offeror's ability to perform the contract successfully. The currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered. This comparative assessment of past performance information is separate from the responsibility determination required under subpart 9.1.
>
> (ii) The solicitation shall describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history, and shall provide offerors an opportunity to identify past or current contracts (including Federal, State, and local government and private) for efforts similar to the Government requirement. The solicitation shall also authorize offerors to provide information on problems encountered on the identified contracts and the offeror corrective actions. The Government shall consider this information, as well as information obtained from any other sources, when evaluating the offeror past performance. The source selection authority shall determine the relevance of similar past performance information.

> (iii) The evaluation should take into account past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition.
>
> (iv) In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance.

14. Section L and M did not describe an approach for evaluating the past performance for offerors with no relevant performance history, in accordance with the requirements of 48 C.F.R. 15.305 (2)(ii). *AR 189-202.*

15. *48 C.F.R § 9.602* clearly encourages teaming arrangements in government procurements to enable the companies involved to complement each other's unique capabilities.

16. The SBA, in making size determination, clearly considers the subcontractor in a teaming agreement as a member of the joint venture for all purposes. Subcontractors upon which the prime contractor is unusually reliant are treated as one entity for the purposes of size determination.. *13 C.F.R 121.103* states:

> (4) A contractor and its ostensible subcontractor are treated as joint venturers, and therefore affiliates, for size determination purposes. An ostensible subcontractor is a subcontractor that performs primary and vital requirements of a contract, or of an order under a multiple award schedule contract, or a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), **agreements** between the prime and subcontractor (such as bonding assistance or the **teaming** agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

17. On or about March 4, 2008, 14 proposals were received from 14 SDVOSB entities. *AR 1769-1789.* Thirteen (13) of the SDVOSB proposals complied with the proposal submission requirements. *AR 1769, 1790.*

18. The DHS established a team of three evaluators (the "TET"), including a Chairperson, Thomas McKernan. The TET evaluated 13 of the 14 proposals in accordance with the requirements of the SOLICITATION. *AR 1769-1788.*

19. On March 20, 2008, four DHS personnel conducted interviews with the "….potential top three technically rated offerors." There were no discussions concerning past performance. *AR 1824.* It appears that the TET was composed of Sohie Sims, Thomas McKernan and Trevor Wood. *AR 1824.*

20. 48 C.F.R. 15.308, which provides for permissible and mandatory exchanges with offerors after receipt of proposals, required DHS to hold discussions with offerors whose past performance is the determining factor preventing them from being placed in the competitive range. The TET found some issues with past performance but conducted no discussions with any of the offerors. Jennifer Weindel (?) found past performance issues with every SDVOSB and conducted no discussions. 48 C.F.R. 15.308 states:

> (a) Clarifications and award without discussions.
>
> (1) Clarifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated.
>
> (2) If award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors.
>
> (3) Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions. If the solicitation contains such a notice and the Government determines it is necessary to conduct discussions, the rationale for doing so shall be documented in the contract file (see the provision at 52.215-1) (10 U.S.C. 2305(b)(4)(A)(ii) and 41 U.S.C. 253b(d)(1)(B)).

> (b) Communications with offerors before establishment of the competitive range. Communications are exchanges, between the Government and offerors, after receipt of proposals, leading to establishment of the competitive range. If a competitive range is to be established, these communications--
>
> (1) Shall be limited to the offerors described in paragraphs (b)(1)(i) and (b)(1)(ii) of this section and--
>
> (i) Shall be held with offerors whose past performance information is the determining factor preventing them from being placed within the competitive range. Such communications shall address adverse past performance information to which an offeror has not had a prior opportunity to respond; and

21. At no time did any of the TET members, Jennifer Weindel, or any representative of DHS conduct discussions with any SDVOSB offeror on the issue of past performance. Once discussions are opened discussions must be held "with offerors whose past performance prevents them from being placed in the competitive range. *AR 1824, 1829-1846.*

22. No TET member eliminated any SDVOSB offeror from the competitive range on the issue of past performance. *AR 1769-1818.*

23. Each of the three TET members independently evaluated and rated each of the 13 proposals. *AR 1469-1747.* The TET then convened, discussed the results of their evaluation and collectively agreed to the ratings of each proposal. *AR 1748-1764.*

24. On April 7, 2008, the Contracting Officer for the SOLICITATION, Gil Olivas, spoke with the TET chairman concerning flaws Mr. Olivas perceived in the technical evaluation. The TET chairman agreed to revise the tech report. *AR 1765-1766.*

25. On or about April 11, 2008, the TET issued a revised technical report including a summary of the ratings of each of the 13 proposals. *AR 1769-1789.*

26. There were four ratings for Past Performance: Very Good, Satisfactory, Neutral and Unsatisfactory. *AR 197.*

27. **Very Good,** the highest possible "Rating for Past Perfomance..," was defined as "(Significant Confidence): Based on the offeror's performance record, essentially no doubt exists the offeror will successfully perform the required effort." *AR 197.*

28. Satisfactory, the second highest possible "Rating for Past Performance…," was defined as "(Confidence): Based on the offeror's performance record, some doubt exists the offeror will successfully perform the required effort." *AR 197.*

29. The symbols (+) or (-) were also used in conjunction with a rating to indicate a stronger or weaker response to a factor or final overall rating. *AR 197.*

30. Of the 13 proposals rated by the team, [redacted] of the proposals had a rating of Very Good or Satisfactory in the Past Performance factor. *AR 1769-1818.*

31. On the factor of Past Performance, [redacted] of the 13 SDVOSB entities rated received the highest rating possible of "Very Good "(Significant Confidence): Based on the offeror's performance record, essentially no doubt exists the offeror will successfully perform the required effort."

32. On or about April 11, 2008, the TET and the Contracting Officer for the SOLICITATION, Gil Olivas, issued a Competitive Review and Best Value Decision that compared all the offers and made a best value determination that the [redacted] offer represented the best value to the Government. "[redacted] team, composed of [redacted] has outstanding past performance and has provided several specific examples of successful transitions with cold starts." *AR 1818.*

33. The Contracting Officer for the SOLICITATION, Gil Olivas, recommended an award to the [redacted] team. *AR 1790-1818.*

34. On or about April 11, 2008, Jennifer Weindel of the DHS became involved in the review process. *AR 1819-1824.*

35. On a date unknown an unknown evaluator, but probably Jennifer Weindel, reviewed all the SDVOSB proposals. The entirety of the review was on past performance of the offerors. The review did not encompass the SDVOSB offeror's team, but separated the SDVOSB from its subcontractors/team members and evaluated each separately. *AR 41.*

36. On a date unknown an unknown individual, but probably Jennifer Weindel, prepared notes ("NOTES") for a meeting with Nina concerning the SOLICITATION. The

NOTES describe the SOLICITATION as flawed and criticize the use of SDVOSB as contractors. The NOTES conclude that the SOLICITATION should be cancelled and re-issued as a full and open competition. *AR 1839-1840.*

37. On April 25, 2008, an unknown individual, but probably Jennifer Weindel, drafted a Brief for presentation to HCA and DHS OSDBU. The writer indicates that "A technical evaluation was conducted and it has been concluded that each of the offeror presents and unacceptable risk to the Government." The writer does not advise the recipients that four other DHS personnel located in the field office in Denver analyzed 13 SDVOSB proposals and concluded that there was no risk to the Government. The conclusions reached in this Brief are the conclusions of one individual, Jennifer Weindel. *AR 1841-1843.*

38. The Brief states that there is a risk inherent in awarding the SOLICITATION to a SDVOSB but does not state or define the "risk". *AR 1841-1843.*

38. In the Determination and Findings ("D&F") dated May 2, 2008, the new Contracting Officer, Jennifer Weindel, states:

> The Past Performance evaluation revealed that none of the offerors demonstrated experience similar to that described above, unless at the subcontract level where teaming arrangement were proposed. In those cases, the benefit of the subcontractor experience was far outweighed by the risk inherent in awarding a contract to a prime contract with little to no relevant experience of its own. As set forth in FAR 52.219-27 "Notice of Total Service Disabled Veteran-owned Small business Set-Aside," SDVOB concern must agree that in performance of the contract, at least 50% of the cost of personnel for contract performance will be spent for employees of concern…". With this mind, fully attributing the experience of subcontractors to a prime with little to no experience that is responsible for the majority effort, is an extreme risk to FPS.
>
> Based on the evaluation of offers received, the CCG concluded that the SDVOB community does not demonstrate the necessary relevant experience to perform a requirement such as this without significant risk to the agency and without an excessive reliance on established, large, security firms acting as subcontractors.

*AR pp 1844-1846.*

39. The D&F states that every SDVOSB concern that submitted a proposal had "little or no experience". *AR pp 1844.*

40. The D&F concludes that the "SDVOSB community" cannot meet the relevant past performance experience requirement of the SOLICITATION by utilizing 50% of the employees of "established, large, security firms acting as subcontractors. *AR pp 1844."*

41. The D&F states that the relevant past performance experience of large, security firms was not considered in the evaluation of any SDVOSB in meeting the Past Performance factors for any SDVOSB that submitted a teaming agreement with a large, security firm. *AR pp 1844.*

42. The D&F states that there is a risk inherent in awarding the SOLICITATION to a SDVOSB but does not state or define the "risk". *AR 1841-1843.*

43. On May 20, 2008, the DHS issued Amendment 00003 canceling the SOLICITATION "because no offeror possessed relevant past performance.". The DHS cancelled the SOLICITATION because the DHS measured the "offeror's ability to successfully perform this effort…" and found that ability in every one of the 13 SDVOSB proposers to be deficient. The DHS made a competency determination on each of their 13 SDVOSBS irrespective of the SDVOSBS teaming partners. *AR 1866.*

44. Amendment 00003 states the performance risk was too high from all offerors received. The term "risk" is not described. *AR 1866.*

45. Amendment 00003 states that "The highest magnitude of any guard service "effort" submitted for review …..was $5.0 million per year" and compared that to the $9.5 million per year of the SOLICITATION. If the SDVOSB is compelled to perform 50% of the effort and $5.0 million is more that 50% of 9.5 million the "effort" is relevant. *AR 1866.*

46. An SDVOSB can subcontract part of an SDVOSB contract if the SDVOSB spends 50% of the cost of contract performance incurred for personnel of the concerns employees. *13 C.F.R. §125.6*

47. The cost of contract performance incurred for personnel is defined as "Direct labor costs and any overhead which has only direct labor as its base, plus the concern's General and Administrative rate multiplied by the labor cost. *13 C.F.R. §125.6(e)(2).*

48. An SDVOSB can enter into a joint venture ("JV") agreement and submit an offer as SDVOSB. *13. C.F.R. § 125.15; 48 C.FR. § 219-27*

49. The SDVOSB JV can subcontract part of an SDVOSB contract if the SDVOSB SBC JV spends 50% of the cost of contract performance incurred for personnel on the concerns employees. *13 C.F.R. §125.6; 13. C.F.R. § 125.15; 48 C.FR. § 219-27*

50 There are no documents in the AR that indicate that the DHS contacted the SBA and advised the SBA that the DHS was withdrawing the SOLITATION from consideration for the SDVOSB program. *AR pp ???*

51. The only guidance in the FAR regarding reasons for canceling a SOLICITATION after bids are received is in *48 C.F.R. 14.404-1*.

52. Jennifer Weindel, or whoever drafted the documents in the AR pp 1829 -1845 did not consider the Technical Factor portion of Section M, of the Source Selection Factors. No consideration was given by Ms, Weindel (?) for the management experience of any of the proposers yet she (?) questions the competency of all the proposers to manage the requirements of the SOLICITATION. *AR 202, 1829-1846.*

53. Of five (5) personnel that reviewed the 13 SDVOSB proposals only Ms. Weindel (?) questions the past performance submissions of all of the SDVOSB's. *AR 1469-1868.*

54. The DHS rejected all 13 proposals and cancelled the SOLICITATION because the individual SDVOSB's did not demonstrate a level of competence to successfully complete the requirements of the SOLICITATION. *AR 1829-1869.*

55. Jennifer Weindel, or whoever drafted the documents in the AR pp 1829 -1845 did not evaluate the proposals in accordance with the parameters of the SOLICITATION. Ms. Weindel (?) refused to give consideration for the team members of any of the proposals. As such Ms. Weindel's "evaluation" was arbitrary, capricious and not in accordance with the requirements of the FAR. *AR 1829-1869.*

56. Jennifer Weindel, or whoever drafted the documents in the AR pp 1829-1845 evaluated every SDVOSB offer unfavorably on the issue of past performance and on that basis rejected every offer thereafter canceling the SOLICITATION. *AR 1829-1869.*

57. Jennifer Weindel, or whoever drafted the documents in the AR pp 1829 -1845, did not evaluate the proposals in accordance with the requirements of 48 C.F.R. 15.305 (2). *AR 1829-1869.*

58. The TET did not evaluate the SDVOSB proposals in accordance with the requirements of 48 C.F.R. 15.305(2) because SDVOSB proposals with no relevant past performance experience were evaluated on the factor of past performance. *AR 1469-1818 ; 48 C.F.R. 15.305 (2).*

59. 48 C.F.R. 15.308 which provides for permissible and mandatory exchanges with offerors after receipt of proposals required DHS to hold discussions with offerors whose past performance is the determining factor preventing them from being place in the competitive range. The TET found some issues with past performance but conducted no discussions with any of the offerors. Jennifer Weindel (?) found past performance issues with every SDOVSB and conducted no discussions. 48 C.F.R. 15.308 states:

> (a) Clarifications and award without discussions.
>
> (1) Clarifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated.
>
> (2) If award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors.
>
> (3) Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions. If the solicitation contains such a notice and the Government determines it is necessary to conduct discussions, the rationale for doing so shall be documented in the contract file (see the provision at 52.215-1) (10 U.S.C. 2305(b)(4)(A)(ii) and 41 U.S.C. 253b(d)(1)(B)).
>
> (b) Communications with offerors before establishment of the competitive range. Communications are exchanges, between the Government and offerors, after receipt of proposals, leading to establishment of the competitive range. If a competitive range is to be established, these communications--
>
> (1) Shall be limited to the offerors described in paragraphs (b)(1)(i) and (b)(1)(ii) of this section and--
>
> (i) Shall be held with offerors whose past performance information is the determining factor preventing them from being placed within the competitive range. Such communications shall address adverse past performance information to which an offeror has not had a prior opportunity to respond; and……

60. The DHS cancelled the SOLICITATION because no acceptable offer were received from SDVOSB firms. Of the 13 proposals the TET and Contracting Officer Gil Olivas reviewed, [redacted] were found to be acceptable for award. Of the [redacted] proposals [redacted] were found to be in the completive range and the DHS opened discussions in accordance with 48 C.F.R. 15.306. *AR pp 1824, 1748-1824.*

61. The DHS "evaluation" by Jennifer Weindel, which was the exclusive review that led to the DHS rejecting all SDVOSB proposals, was in violation or did not properly consider

the requirements of the following statutes: 48 C.F.R..§ 52.219-27, 48 C.F.R. § 52.212-3, 48 C.F.R. 15.305, 48 C.F.R. 121.103, 48 C.F.R. 15.308, *13 C.F.R. §125.6; 13. C.F.R. § 125.15; 48 C.FR. § 52.219-27 and 48 C.F.R. 14.404-1.*

## III. JURISDICTION AND STANDARD OF REVIEW FOR MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

The Tucker Act, as amended by the Administrative Disputes Resolution Act (ADRA), 28 U.S.C. § 1491(b) (2000), confers jurisdiction on this court to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.28 U.S.C. § 1491(b)(1). The court reviews a bid protest action under the standards set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); *NVT Techs., Inc. v. United States (NVT Techs.)*, 370 F.3d 1153, 1159 (Fed.Cir.2004). The APA provides that an agency's decision is to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A);

Under the arbitrary or capricious standard of review, the court must sustain an agency's award if it has a rational basis. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co. (Motor Vehicle Mfrs.)*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citation omitted). In particular, the reviewing court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe (Overton Park)*, 401 U.S. 402, 416-20, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Moreover, in a "best value" procurement greater deference is given to the agency than "if the contract were to have been awarded on the basis of cost alone." *Galen*, 369 F.3d at 1330

(citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed.Cir.1996)); *see* Precision Images, LLC v. United States, 79 Fed.Cl. 598, 615 (2007).

The APA standard by applying the standard as previously interpreted by the district [court in Scanwell Labs., Inc. v. Shaffer (Scanwell), 424 F.2d 859 (D.C.Cir.1970)]. The Federal Circuit has stated that, under the APA standard applied in Scanwell, and now under the ADRA, " 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.' " Id. (quoting Impresa, 238 F.3d at 1332). When challenging a procurement on the ground of a regulatory violation, the protester " 'must show a clear and prejudicial violation of [the] applicable statutes or regulations.' " Id. (quoting Impresa, 238 F.3d at 1333).

PLAINTIFF must also "show that there was a 'substantial chance' [that] it would have received the contract award absent the alleged error." Id. (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed.Cir.2001)). Similarly, if an agency's decision is found to have been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), a protestor must also show that the error was significantly prejudicial, Alfa Laval Separation, Inc. v. United States (Alfa Laval), 175 F.3d 1365, 1367 (Fed.Cir.1999) ("To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process." (citations omitted)). " 'To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.' " Id. (quoting Data General Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed.Cir.1996)). Instead, a protester "must show that there was a 'substantial chance' it would have received the contract award but for the errors." Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed.Cir.2005) (citing Info. Tech. & Applications Corp. v. United States (Info Tech.), 316 F.3d 1312, 1319 (Fed.Cir.2003)); Alfa Laval, 175 F.3d at 1367.

With respect to pre-award protests, a protestor may be required to show only "that an unreasonable agency decision 'created a non-trivial competitive injury which can be redressed by judicial relief.' " Id. (quoting WinStar Comm., Inc. v. United States, 41 Fed.Cl. 748, 763

(1998)). The different standards for pre-award and post-award relief are explained as resulting from the fact that the "substantial chance" test "envisions a review of the contract award or bid evaluation process to determine what might have occurred if the government had not erred." *Id.* (quoting *WinStar*, 41 Fed.Cl. at 763 n. 9). By contrast, in a pre-award solicitation-based protest, "the evaluation of offers has not even begun." *Id.* (quoting *WinStar*, 41 Fed.Cl. at 763 n. 9).

In deciding whether to issue a permanent injunction, "a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed.Cir.2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

Standing to bring a protest as an "interested party" under the ADRA is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001). The Federal Circuit has further defined "interested party" as a party having "greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." *Info. Tech.*, 316 F.3d at 1319. "The term 'interested parties' excludes those who did not submit proposals, bidders who withdrew from a solicitation, and offerors who were not competitively ranked for award." *Microdyne Outsourcing, Inc. v. United States*, 72 Fed.Cl. 230, 232 (2006) (citing *Impresa*, 238 F.3d at 1334).

## IV.

## THE CONTRACTING OFFICERS DECISION TO REJECT ALL THIRTEEN SDVOSB's ON THE BASIS THAT NO SDVOSB HAD RELEVANT PAST PERFORMANCE IS ARBITRARY, CAPRICIOUS AND CONTRARY TO EXISTING LAW

On or about February 19, 2008, the Department of Homeland Security ("DHS") issued a SOLICITATION requesting proposals for Colorado Armed Guard Services. Before issueing the SOLICITATION market research was completed in regards to the ability of SDVOSB to successfully complete the requirements of the SOLICITATION. *Statement of Fact ("SOF") 1-6.*

On February 27, 2008, the DHS issued Amendment 00001 which, in addition to SOLICITATION related issues, responded to various questions regarding the past performance factors required by Sections L and M of the SOLICITATION and the manner with which teaming arrangement were to be considered. The answers indicated that teaming arrangements, is satisfactorily established, would be considered as relevant in assessing the past performance factor requirement. *SOF 7-11.*

Amendment 00002 provided revised Sections B, L and M to all prospective offerors. Section L included the instruction for submitting the proposal and a past performance questionnaire. Section M stated the Evaluation Factors and the basis for award. *SOF 12*

In addition to the stated requirement of Amendment 00002 48 C.F.R. provides mandatory guidance to the DHS on the issue of evaluating best value proposals. DHS was to evaluate proposals with no past performance history in accordance with an approach to be stated in the SOLICITATION. The SOLICITATION did not include an approach for evaluating proposals with no or little past performance history. SOF 12-13.

The DHS evaluation was consider past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition. In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance. SOF 12-13.

Section L and M did not describe an approach for evaluating the past performance for offerors with no relevant performance history, in accordance with the requirements of 48 C.F.R. 15.305 (2)(ii). *SOF 14.*

In best value procurements this consideration for encouraging teaming arrangements to allow small businesses to compete for complex procurements in stated many times in the FAR *48 C.F.R § 9.602* clearly encourages teaming arrangements in government procurements to enable the companies involved to complement each other's unique capabilities. The SBA, in making size determination, clearly considers the subcontractor in a teaming agreement as a member of the joint venture for all purposes. Subcontractors upon which the prime contractor are unusually reliant are treated as one entity for the purposes of size determination. *SOF 15 & 16.*

In response to the RFP, fourteen SDVOSB proposals were received from SDVOSB entities. Thirteen (13) of the SDVOSB proposals complied with the proposal submission requirements. *SOF 17 & 18.*

The DHS established a TET that evaluated 13 of the 14 proposals in accordance with what the TET understood to be the requirements of the SOLICITATION On March 20, 2008, four DHS personnel conducted interviews with the "….potential top three technically rated offerors." There were no discussions concerning past performance. 48 C.F.R. 15.308 required DHS to hold discussions with offerors whose past performance is the determining factor preventing them from being placed in the competitive range. The TET found some issues with past performance but conducted no discussions with any of the offerors on the issue of past performance. No TET member eliminated any SDVOSB offeror from the competitive range on the issue of past performance. *SOF 20-22.*

Each of the three TET members independently evaluated and rated each of the 13 proposals. *AR 1469-1747.* The TET then convened, discussed the results of their evaluation and collectively agreed to the ratings of each proposal. On April 7, 2008, the Contracting Officer for the SOLICITATION, Gil Olivas, spoke with the TET chairman concerning flaws Mr. Olivas perceived in the technical evaluation. The TET chairman agreed to revise the tech report. On or about April 11, 2008, the TET issued a revised technical report including a summary of the ratings of each of the 13 proposals. *SOF 23-25.*

There were four ratings for Past Performance: Very Good, Satisfactory, Neutral and Unsatisfactory.**Very Good,** the highest possible "Rating for Past Performance..," was defined as "(Significant Confidence): Based on the offeror's performance record, essentially no doubt exists the offeror will successfully perform the required effort." Satisfactory, the second highest possible "Rating for Past Performance…," was defined as "(Confidence): Based on the offeror's performance record, some doubt exists the offeror will successfully perform the required effort". The symbols (+) or (-) were also used in conjunction with a rating to indicate a stronger or weaker response to a factor or final overall rating. *SOF 26-29.*

Of the 13 proposals rated by the team, [redacted] of the proposals had a rating of Very Good or Satisfactory in the Past Performance factor. On the factor of Past Performance, [redacted] of the 13 SDVOSB entities rated received the highest rating possible of "Very Good "(Significant Confidence): Based on the offeror's performance record, essentially no doubt exists the offeror will successfully perform the required effort." *SOF 30 & 32.*

On or about April 11, 2008, the TET and the Contracting Officer for the SOLICITATION, Gil Olivas, issued a Competitive Review and Best Value Decision that compared all the offers and made a best value determination that the Integrated Security Force's offer represented the best value to the Government. "[redacted] has outstanding past performance and has provided several specific examples of successful transitions with cold starts." Mr. Olivas, recommended an award to one of the PLAINTIFFS, [redacted] *SOF 32 & 33.*

On or about April 11, 2008, Jennifer Weindel of the DHS became involved in the review process. It appears that Ms. Weindel reviewed the TET finding and began a review of the proposals solely on the issue of the past performance of each offeror separate from its team Ms. Weindel concluded that "each of the offeror presents and unacceptable risk to the Government." Ms. Weindel states that there is a risk inherent in awarding the SOLICITATION to a SDVOSB but does not state or define the "risk". SOF 34-38.

Ms Weindel drafted the D&F states that every SDVOSB concern that submitted a proposal had “little or no experience”. The D&F concludes that the “SDVOSB community” cannot meet the relevant past performance experience requirement of the SOLICITATION by utilizing 50% of the employees of “established, large, security firms acting as subcontractors. The D&F states that the relevant past performance experience of large, security firms was not considered in the evaluation of any SDVOSB in meeting the Past Performance factors for any SDVOSB that submitted a teaming agreement with a large, security firm. The D&F states that there is a risk inherent in awarding the SOLICITATION to a SDVOSB but does not state or define the “risk”. *SOF 39-43.*

On May 20, 2008, the DHS issued Amendment 00003 canceling the SOLICITATION “because no offeror possessed relevant past performance.”. The DHS cancelled the SOLICITATION because the DHS measured the “offeror’s ability to successfully perform this effort…” and found that ability in every one of the 13 SDVOSB proposers to be deficient. The DHS made a competency determination on each of their 13 SDVOSBS irrespective of the SDVOSBS teaming partners. Amendment 00003 states the performance risk was too high from all offerors received. The term “risk” is not described. *SOF 43-45.*

Ms Weindel conclusions were arrived at by ignoring the requirement of procurement law on best value negotiated procurements. It is clear and unassailable that in considering the relevance of past performance of each proposer the entire team must be considered not an individual member under the myopic scrutiny conducted by Ms. Weindel. A reasonable reviewer would have at least defined or established the performance risk before proceeding to arriving at conclusions that are not supportable. Amendment 00003 states that “The highest magnitude of any guard service “effort” submitted for review …..was $5.0 million per year” and compared that to the $9.5 million per year of the SOLICITATION. If the SDVOSB is compelled to perform 50% of the effort and $5.0 million is more that 50% of 9.5 million the “effort” is relevant. Thus, even under the myopic analysis of Ms. Weindel at least one SDVOSB survives. *SOF 36-45.*

Apparently the "risk" of failure of performance was known only to Ms. Weindel and not to the TET and Mr. Olivas since the evaluations of the TET and Mr. Olivas are effusively positive on the ability of at least four of the SDVOSB's. *SOF 6, 22-33.* There is not indication in the AR that Ms. Weindel contacted any of the TET or Mr. Olivas to discuss her solitary evaluation of each SDVOSB. The failure of Ms Weindel to contact any of the DHS representative in the field office to discuss the SOLICITATION is real evidence of the arbitrary nature of her analysis.

The facts, supported by procurement law, is that an SDVOSB can subcontract part of an SDVOSB contract if the SDVOSB spends 50% of the cost of contract performance incurred for personnel of the concerns employees. An SDVOSB SBC can enter into a joint venture ("JV") agreement and submit an offer as SDVOSB SBC. The SDVOSB can subcontract part of an SDVOSB contract if the SDVOSB spends 50% of the cost of contract performance incurred for personnel on the concerns employees. *SOF 46-50.*

Ms. Weindel did not consider the Technical Factor portion of Section M, of the Source Selection Factors in any evaluation of the proposals. No consideration was given by Ms, Weindel (?) for the management experience of any of the proposers yet she (?) questions the competency of all the proposers to manage the requirements of the SOLICITATION. Since the SOLICITATION states that Technical and Past Performance factors are equal in importance, any consideration of only the Past Performance factor without a consideration of the Technical portion of each proposal is simply irrational and arbitrary. An evaluation of proposals by only considering past performance is also a violation of the stated criteria for evaluation. *SOF 12.* On this issue alone this Court could hold that the DHS rejection of all proposals was arbitrary, irrational, and unreasonable and in violation of the procedures required by the SOLICITATION.

On the solitary evaluation of Ms. Weindel, the DHS rejected all 13 proposals and cancelled the SOLICITATION because the individual SDVOSB's did not demonstrate a level of competence to successfully complete the requirements of the SOLICITATION. Ms Weindel did not evaluate the proposals in accordance with the parameters of the

SOLICITATION nor the requirement of federal procurement law and, as such Ms. Weindel's, "evaluation" was arbitrary, capricious and not in accordance with the requirements of the FAR. *SOF 51-61*.

**V.**

**<u>THERE WAS A SUBSTANTIAL CHANCE ONE OF THE PLAINTIFFS WOULD HAVE RECEIVED THE CONTRACT AWARD BUT FOR DHS's ARBITRARY , CAPRICIOUS AND IRRATIONAL EVALUATION AND CLEAR VIOLATION OF PROCUREMENT LAW.</u>**

On or about April 11, 2008, the TET and the Contracting Officer for the SOLICITATION, Gil Olivas, issued a Competitive Review and Best Value Decision that compared all the offers and made a best value determination that the [redacted] offer represented the best value to the Government. "[redacted] has outstanding past performance and has provided several specific examples of successful transitions with cold starts." The Contracting Officer for the SOLICITATION, Gil Olivas, recommended an award to the [redacted] *SOF 32 & 33.*

Standing to bring a protest as an "interested party" under the ADRA is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." <u>*Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001)</u>. The Federal Circuit has further defined "interested party" as a party having "greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." <u>*Info. Tech.*, 316 F.3d at 1319.</u> "The term 'interested parties' excludes those who did not submit proposals, bidders who withdrew from a solicitation, and offerors who were not competitively ranked for award." <u>*Microdyne Outsourcing, Inc. v. United States*, 72 Fed.Cl. 230, 232 (2006)</u> (citing <u>*Impresa*, 238 F.3d at 1334).</u>

But for the rejection of all proposals and the cancellation of the SOLICITATION [redacted] would have been awarded the SOLICITATION. As all of the PLAINTIFFs submitted proposals and were ranked in the [redacted] of 13 proposals each of the PLAINTIFF's has standing.

**VI.**

**SUMMARY**

On the solitary evaluation of Ms. Weindel, the DHS rejected all 13 proposals and cancelled the SOLICITATION because the individual SDVOSB's did not demonstrate a level of competence to successfully complete the requirements of the SOLICITATION. Ms Weindel did not evaluate the proposals in accordance with the parameters of the SOLICITATION nor the requirement of federal procurement law and, as such Ms. Weindel's, "evaluation" was arbitrary, capricious and not in accordance with the requirements of the FAR.

The DHS cancelled the SOLICITATION in accordance with FAR 19.1405(c) for the reason that no acceptable proposals had been received from any one of 13 SDVOSB proposals. As this Motion makes clear the rejection violated procurement procedure and law and as such must be set aside.

PLAINTIFF's request this Court order the DHS to make an award to the SDVOSB that has offered the best value proposal in response to this SOLICITATION.

Dated: July 24, 2008.

Respectfully submitted,

s/ William L Bruckner
William L. Bruckner
BRUCKNER & WALKER, LLP
4550 Kearny Villa Road, Suite 209
San Diego, CA 92123
(858) 565-8300 Telephone
(858) 565-0813 Facsimile
bill@brucknerwalker.com

Attorneys for DCMS-ISA, Inc., L&R Security Forces, Inc. (Integrated Security Forces, Inc.); The Whitestone Group, Inc.; and R&D Training and Technical Services (RDTTS)

CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2008 a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Tiffany Adams