# In the United States Court of Federal Claims

### No. 08-456C
### (Filed: November 14, 2008*)
### *OPINION ORIGINALLY FILED UNDER SEAL ON OCTOBER 20, 2008

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **DCMS-ISA, INC., L & R** | * | |
| **SECURITY FORCES, INC.,** | * | |
| **THE WHITESTONE GROUP,** | * | |
| **INC., and R & D TRAINING** | * | |
| **AND TECHNICAL SERVICES,** | * | **Bid Protest; Negotiated Procurement;** |
| **INC.,** | * | **SDVOSB Set-Aside; Cancellation;** |
| | * | **FAR 15.305(b); FAR 52.219-27; FAR** |
| **Plaintiffs,** | * | **9.604(e); FAR 19.1405(c); FAR** |
| | * | **15.206(e); FAR 15.308; FAR Subpart** |
| **v.** | * | **9.1** |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * | * | |

*William L. Bruckner,* San Diego, CA, for plaintiffs.

   *Tara J. Kilfoyle,* U.S. Department of Justice, Washington, DC, with whom were *Gregory G. Katsas, Assistant Attorney General* and *Director Jeanne E. Davidson,* for defendant. *Michael Davidson*, Department of Homeland Security, Washington, DC, of counsel.

## A M E N D E D   O P I N I O N[1]

**FIRESTONE**, *Judge*.

   Pending before the court in this bid protest action are the parties' cross-motions for

judgment upon the administrative record pursuant to Rule 52.1 of the Rules of the United

---

   [1]This Amended Opinion includes corrections submitted by the parties during the period for filing requests for redaction of the initial Opinion.

States Court of Federal Claims ("RCFC") and the motion by the plaintiffs, DCMS-ISA,

Inc. ("DCMS-ISA"), L&R Security Forces, Inc. ("L&R") (also known as Integrated

Security Forces, Inc. ("ISF")), the Whitestone Group, Inc. ("Whitestone"), and R&D

Training and Technical Services ("RDTTS") (collectively, "plaintiffs"), for an order

directing the defendant, the United States ("defendant" or "government"), to refer the

Service-Disabled Veteran-Owned Small Business ("SDVOSB") proposers in this case to

the Small Business Administration ("SBA") for a Certificate of Competency ("COC").  In

their complaint, the plaintiffs assert that the Department of Homeland Security ("DHS" or

"agency") acted arbitrarily, capriciously, and not in accordance with law when it rejected

all bids and canceled a solicitation issued as a competitive SDVOSB set-aside because

none of the SDVOSB offerors had sufficient relevant past performance experience unless

their proposed teaming arrangements were taken into account.  The plaintiffs seek

injunctive relief directing DHS to reinstate the solicitation, review the SDVOSBs'

proposals, and award the contract to one of the SDVOSBs.  In addition, in their motion

for an order referring the matter to the SBA ("motion to refer to the SBA"), the plaintiffs

contend that DHS did not have the authority to reject the bids based on the past

performance of the offerors, arguing that those rejections constituted "responsibility

determinations" that may only be made by the SBA through its COC program.

In its cross-motion for judgment on the administrative record, the government

contends that the agency's decision to cancel and resolicit using a different acquisition

strategy complied with all applicable statutes and regulations.  In addition, the government argues, to the extent the court finds it has jurisdiction in the absence of a statutory or regulatory violation to consider the plaintiffs' claim that the cancellation lacked a rational basis, the contracting officer's decision to cancel the solicitation because no proposals were received from SDVOSB offerors with relevant past performance was rational.  In response to the plaintiffs' motion to refer to the SBA, the government argues that the contracting officer was not required to find any SDVOSB offeror non-responsible prior to deciding to cancel the solicitation, but rather that the agency was entitled to cancel on the grounds that the solicitation did not elicit any SDVOSB offerors with the type of past performance experience the agency was seeking.

For the reasons set forth below, the government's motion for judgment on the administrative record is **GRANTED**, and the plaintiffs' motions for judgment on the administrative record and to refer to the SBA are both **DENIED**.

I.      **BACKGROUND FACTS**

The following facts are undisputed unless otherwise noted.  Federal Protective Services ("FPS") is the security and law enforcement component of DHS Immigration and Customs Enforcement ("ICE") and is responsible for protecting certain federally-owned or leased facilities.  Def.'s Mot. at 2.  Prior to June 1, 2007, FPS decided to issue a solicitation for a reacquisition for guard services for FPS Region 8, which was being performed at the time under a contract with the incumbent, Am-Gard, Inc. ("Am-

Gard").  Administrative Record ("AR") 2-3.

In August 2007, ICE conducted market research for the acquisition by posting a "Request for Information/Sources Sought" on the Federal Business Opportunities website.  AR 3.  ICE received forty responses to the Request, including twenty-five from SDVOSBs.[2]  Id. at 3-4.  In a memorandum entitled "Market Research for Region 8 – Reacquisition of Guard Services," ICE noted that the ICE program manager reviewing the SDVOSB responses "found five potential offerors that exhibited the capabilities and similar magnitude on other contracts."[3]  Id. at 4.  The memo described each of these five potential offerors and concluded that "the Government has significant confidence that a[n] SDVO[S]B contractor can be found that will be able to successfully perform all of the requirement[s] of this procurement."  Id. at 6.

On February 19, 2008, ICE's West Consolidated Contracts Group ("W-CCG") issued Solicitation HSCEW8-08-R-00004 as a set-aside for SDVOSBs, requesting proposals for armed guard services for FPS in approximately fifty federal buildings across ten cities in the Denver, Colorado area, requiring approximately 350,000 productive

---

[2]The administrative record regarding this market research refers to Service Disabled Veteran Owned Businesses ("SDVOBs") rather than SDVOSBs, AR 4-6, but both the plaintiffs and the government describe it as referring to SDVOSBs.  Pl.'s Mot. JAR at 3; Def.'s Mot. at 2-3.  For the sake of simplicity, the court will refer to both SDVOBs and SDVOSBs as SDVOSBs throughout this opinion.

[3]The five potential SDVOSB companies identified were Integrity Case International Security Services, Inc. ("IISS"), Whitestone, United Global Security, Inc. ("USGI"), CDA Detective and Security Services ("CDA"), and Culpepper and Associates Security Services ("CASS").  AR 5, 1843.

armed guard hours annually.  Id. at 7-170, 1844; Def.'s Mot. at 3.  The proposed period of performance was a one-year base period plus four one-year option periods "to be exercised at the sole discretion of the Government."  AR 170-G.  The estimated value of the acquisition if all options were exercised was $55,000,000.  Id. at 11-13.  The solicitation provided that contractor teaming arrangements were permitted "in accordance with [Federal Acquisition Regulation ('FAR')] Subpart 19.1."  Id. at 70.  The solicitation explicitly stated: "Please be advised that this Request for Proposal (RFP) in no manner obligates the Government regarding award of a contract, task order or modification that results from the issuance of this RFP."  Id. at 7 (emphasis added), 170-G (same).

Offerors were required to submit their proposals in three volumes: a technical capability volume, a past performance volume, and a price quotation volume.  Id. at 170G-I.  The solicitation was to be awarded to the "offeror representing the best value to the government."  Id. at 170-I.  The solicitation provided that past performance and technical capability would be equal in importance in determining the offer that represented the best value to the government and, when combined, would be significantly more important than price.  Id. at 170-O.

With regard to past performance information, the solicitation stated that offerors should provide "a summary of your firms's most recent, and relevant efforts during the last three (3) years" and that a maximum of three references should be provided.  Id. at 170-I.  It also identified the manner in which past performance would be evaluated:

Past performance will be evaluated as a measure of the Government's confidence in the offeror's ability to successfully perform based on previous and current contract and/or task order efforts. The Government will evaluate the past performance data submitted for recency, relevancy, and realism/quality. Relevancy of past performance data will be determined by considering performance on contracts and/or task orders of a similar nature, size, scope, dynamic environment and complexity, utilizing a comparable number of personnel with like skills. Some past performance data may be considered more relevant to this RFP than other data.

Id. at 170-I, 183, 195. The solicitation further stated that the "[c]ontractor shall demonstrate satisfactory performance under contracts with similar requirements," explaining that "similar" would be "defined in terms of size and complexity of this solicitation." Id. at 170-O. The solicitation also set forth the ratings system that would be used to evaluate past performance. Id. at 170-J, 185, 197. "Based on the offeror's performance record," a rating of "Very Good (Significant Confidence)" indicated that "essentially no doubt exists the offeror will successfully perform the required effort," while a rating of "Satisfactory (Confidence)" indicated "some doubt" and a rating of "Unsatisfactory (No Confidence)" indicated "extreme doubt." Id. at 170-J. However, the solicitation provided that a "Neutral (Unknown Confidence)" rating would be given where "[n]o relevant performance record [was] identifiable. Id. at 170-J, 185, 197.

On February 27, 2008, ICE issued Amendment No. 0001 to the solicitation. Id. at 171. Amendment No. 0001 amended Section L of the solicitation, entitled "Proposal Instructions," incorporated questions and answers ("Q&A") from prospective offerors, and extended the due date for proposals to March 1, 2008. Id. at 10, 171-88. The first

Q&A incorporated by Amendment No. 0001 addressed teaming agreements:

> Is a teaming agreement with the SDVOSB having 51% management control satisfactory for this requirement?  Yes, in accordance with FAR 52.212-3[, 48 C.F.R. § 52.212-3 (2006), provided] in Section K [of the solicitation] and [FAR] 52.219-27[, 48 C.F.R. § 52.219-27 (2006), provided] in Section I [of the solicitation].

Id. at 173 (emphasis in original).  The second Q&A provided that, if a teaming arrangement was to be used, a signed teaming agreement was required to be part of the proposal.  Id. at 173.  The fourth Q&A addressed the experience of teaming partners:

> Will the organization, financial capability, experience, accounting control and technical skills of the teaming partner suffice if the SDVOSB is less experienced?  See FAR 52.212-3 and 52.219-27.

Id. (emphasis in original).  A subsequent Q&A referred to past performance references for teaming partners: "May both the prime and partner submit past performance if in partnership and if so limited to 3 total or 3 each?  Yes.  Limit to 3 each."  Id. at 175 (emphasis in original).

On February 29, 2008, ICE issued Amendment No. 0002, revising various sections of the solicitation.  Id. at 189.  As revised by Amendment No. 0002, the solicitation required that the technical capability volume describe the offeror's "technical excellence and management capability," supervision, and staffing plan.  Id. at 194.

## A.      Offers Received in Response to the Solicitation

Fourteen SDVOSB offerors submitted proposals in response to the solicitation, of which thirteen were found in an initial screening to have met the proposal submission

requirements.  AR 1769.  Of those thirteen, eleven involved teaming arrangements

between SDVOSB prime contractors and larger, established security guard businesses.[4]

Id. at 1769, 1839.  Each of the plaintiffs in this case submitted a timely proposal

involving teaming arrangements in response to the solicitation.  Pursuant to these teaming

agreements,[5] the plaintiff SDVOSB companies were to be the prime contractors, and the

companies with which they teamed were to be subcontractors.

### 1.    DCMS-ISA's Proposal

For purposes of responding to the solicitation, Demolition and Construction

Management Services ("DCMS"), an SDVOSB, and International Security Agency

("ISA") formed the joint venture DCMS-ISA, which, in turn, entered into a teaming

arrangement with Am-Gard, the incumbent contractor.[6]  AR 211, 214.  The DCMS-ISA

proposal provided three past performance references for Am-Gard.  Id. at 250-55.  In

---

[4]Of the five companies that the market research memo, described supra, found to "exhibit[] the capabilities and similar magnitude on other contracts," IISS, Whitestone, and CASS submitted proposals in response to the solicitation.  AR 4, 570, 658, 1200.  With regard to IISS, the market research memo had noted that "this would be the largest award this firm has received . . . ."  Id. at 4.  With regard to Whitestone, the memo had noted that "[t]here are some questions about the dollar value and duration of [Whitestone's] previous contracts . . . ."  Id. at 4.  With regard to CASS, the memo had noted that "CASS's past contracts are different enough in scope to raise some questions . . . ."  Id. at 6.

[5]Although Amendment No. 0001 required a signed teaming agreement as part of an offeror's proposal if the proposal involved a teaming arrangement, Whitestone's proposal did not include a signed teaming agreement.  AR 173, 658-730.

[6]The teaming agreement submitted as part of DCMS-ISA's proposal specified that "[t]he parties shall act as independent contractors and . . . the employees of one shall not be deemed the employees of the other," and that DCMS-ISA, as the prime contractor, would "be responsible for the quality of all products submitted . . . ."  AR 236.

addition, the proposal provided three past performance references for DCMS, consisting of (1) a bridge replacement contract with the United States Department of Agriculture ("USDA") Forest Service, (2) a contract with the Forest Service to improve a recreation area, and (3) a contract with the Forest Service to repair hurricane-damaged work centers.[7]  Id. at 257-59.

### 2.    L&R/ISF's Proposal

L&R, an SDVOSB, entered into a teaming arrangement with C&D Security, Inc. ("C&D"), a small business, and Engineering and Professional Services ("EPS"), another SDVOSB, for purposes of responding to the solicitation.  AR 733-34, 822-29, 1829.  The proposal referred to the team as "Integrated Security Force" ("ISF").  Id. at 735.  Pursuant to the teaming agreement, L&R was to be the prime contractor, and C&D and EPS were to be subcontractors.[8]  Id. at 735, 822.  Pursuant to the "statement of work" for the teaming agreement, L&R was to perform at least fifty percent of the value of the services under the contract, with C&D and EPS sharing the remaining portion equally.  Id. at 829.

---

[7]DCMS-ISA also submitted three "letters of recommendation" for ISA.  AR 243-46. These letters provided little or no information about the nature, size, scope, or complexity of the work that ISA performed.  Id.  One letter was from an organization called "Underground Wrestling."  Id. at 244.  Another was from an organization called "Elite Fighting Xtreme Professional Fight Company."  Id. at 246.

[8]The teaming agreement specified that "L&R, as the prime contractor, will have responsibility to the customer for the performance of this contract," AR 823, that the agreement was "not intended by the parties to constitute or create a joint venture, pooling arrangement, partnership, or formal business organization of any kind, other than contractor team arrangements as set forth in FAR 9.6," and that "[t]he parties shall act as independent contractors at all times . . . and the employees of one shall not be deemed the employees of the other."  AR 825.

L&R/ISF provided one past performance reference for L&R.  Id. at 769.  The reference

was for a security services contract with the United States Army Corps of Engineers, New

Orleans District, which required twenty-seven security guards.  Id.  The total contract

value was approximately $8,618,000, and the period of performance was approximately

eight years.[9]  Id.

### 3.    Whitestone's Proposal

Whitestone, an SDVOSB, entered into a teaming agreement with AlliedBarton

Security Services, LLC ("AlliedBarton"), for purposes of responding to the solicitation.[10]

AR 664.  Whitestone's proposal described AlliedBarton as "the largest American-owned

private security provider that has been in business for over 50 years . . . ."  Id.  Whitestone

submitted two past performance references for AlliedBarton.  Id. at 711-13.  Whitestone

also provided three past performance references for Whitestone, consisting of (1) a

security services contract with the USDA National Animal Disease Center, which

required twenty-eight security officers and for which the total contract value was

approximately $4,600,000 over approximately five years, (2) a security services contract

with the United States Army Medical Research Institute of Infectious Diseases, which

required forty-six security officers and for which the total contract value was

---

[9]L&R/ISF also provided two past performance references for C&D and one for EPS.  AR 767-71.

[10]As noted supra, Whitestone did not submit a signed teaming agreement with its proposal.  AR 173, 658-730.

approximately $4,500,000 over approximately three years, and (3) a security services contract with the USDA Animal and Plant Health Inspection Services, which required six security officers and for which the total contract value was approximately $1,100,000 over approximately five years.  Id. at 708-10.

### 4.    RDTTS's Proposal

RDTTS, an SDVOSB, entered into teaming agreements with HarborSite International ("HarborSite"), also an SDVOSB, and Pond Security Services, LLC ("Pond"), for purposes of responding to the solicitation.  AR 1268, 1273, 1412-24. Pursuant to these teaming agreements, RDTTS was to be the prime contractor, and Pond and HarborSite were to be subcontractors.[11]  Id. at 1412, 1418.  According to RDTTS's teaming agreements with Pond and HarborSite, if FPS awarded a prime contract to RDTTS, RDTTS would enter into a subcontract with Pond, pursuant to which Pond would provide "28 Percent of the total manpower effort" for the awarded contract, AR 1413, and a subcontract with HarborSite, pursuant to which HarborSite would provide "12 Percent of the total manpower effort" for the awarded contract.  Id. at 1419.  RDTTS

---

[11]RDTTS's teaming agreements with both Pond and HarborSite specified that, as the prime contractor, RDTTS would "play the primary role in all post-award Program activities, including but not limited to program management, technical direction, systems integration, Government liaison, and selection and direction of all subcontractors."  AR 1413, 1419. RDTTS's teaming agreements further specified that they were "not intended by the parties to constitute or create a joint venture, pooling arrangement, partnership, or formal business organization of any kind, other than contractor team arrangements as set forth in FAR 9.6" and that "[t]he parties shall act as independent contractors at all times . . . and the employees of one shall not be deemed the employees of the other."  AR 1416, 1422.

provided three past performance references for RDTTS, consisting of (1) a contract to

perform radio repair services at an Army Depot, (2) a contract to provide printer

maintenance and support services for the United States Joint Forces Command, and (3) a

contract to provide preventative and remedial computer maintenance services for the

Naval Surface Warfare Center.[12] Id. at 1316-18.

### B.      W-CCG's Evaluation of Proposals

W-CCG convened a Technical Evaluation Team ("TET"), consisting of a

chairperson and three members, which was responsible for evaluating the proposals and

providing a technical evaluation report. See AR 1476-78, 1748, 1769. The TET

submitted an initial technical evaluation report to Gilbert Olivas, the W-CCG Contracting

Officer initially assigned to the solicitation. Id. at 1748. The TET's initial evaluation

rated Millennium Security Services's ("Millennium's") proposal the highest. Id.

On March 20, 2008, W-CCG opened communications with the potential top three

technically rated offers according to the original technical evaluation report – Millennium

(with its subcontractor, Security Consultants Group, Inc.), RDTTS, and Whitestone. Id.

at 1824. On or about April 7, 2008, however, Mr. Olivas identified flaws in the TET's

initial technical evaluation report, indicating that the TET's ratings and rankings were

"not in keeping with the source selection plan criteria." Id. at 1765. Accordingly, the

TET revised its technical evaluation report and submitted its final evaluation of proposals

---

[12]RDTTS also provided three past performance references for Pond and three for
HarborSite. AR 1319-22.

to Mr. Olivas on April 11, 2008, rating L&R/ISF's proposal most highly, Whitestone's

second, RDTTS's fourth, and DCMS-ISA's fifth.  Id. at 1769-89.  Based upon the TET's

final technical evaluation report, Mr. Olivas and W-CCG Contracting Specialist Sophie

Sims prepared a Competitive Review and Best Value Decision, concluding that

L&R/ISF's proposal represented the best value to FPS.  Id. at 1790-1818.

However, on April 11, 2008, Nina Ferraro, the Director of FPS's Acquisition

Management Division, instructed Jennifer Weindel, the Chief of the Consolidated

Contracts Group ("CCG") Support Branch, not to schedule a Contract Review Board for

the proposed award.  Id. at 1820.  Ms. Ferraro subsequently directed that the solicitation

documents be transferred to Ms. Weindel, who would assume the role of Contracting

Officer.[13]  Id. at 1819, 1846.

## C.    Contracting Officer Jennifer Weindel's Independent Review

W-CCG sent the proposals and contract files to Ms. Weindel for review.  AR

1819, 1846.  Ms. Weindel reviewed materials pertaining to the solicitation, including the

proposals, technical evaluation report, and Competitive Review and Best Value Decision.

---

[13]At that time, there was a concern that W-CCG personnel had potentially improperly engaged in discussions with fewer than all of the offerors in the competitive range, in violation of FAR 15.306(d)(1), 48 C.F.R. § 15.306(d)(1) (2005), as well as a concern that the Procurement Integrity Act ("PIA"), 41 U.S.C. § 423 (2002), may have been violated.  AR 1822-28, 1840.

Because the court finds acceptable Ms. Weindel's determination that the "competitive range" as determined by the TET was invalid, as discussed infra, the court need not address the concern over discussions with fewer than all offerors in that range in potential violation of FAR 15.306(d)(1).  Moreover, although the potential PIA violation is the subject of an ongoing investigation, Def.'s Mot. at 17 n.8, "it has been determined that the procurement could have proceeded despite the potential PIA violation," Def.'s Supp. Br. at 7, and accordingly, the court need not consider that potential violation.

Id. at 1829-38.  Ms. Weindel reviewed the offerors' past performance submittals to determine the experience of the offerors, "to include prime and subs." Id. at 1829.  In the informal notes she prepared during her review, Ms. Weindel noted that the solicitation did not state how FPS would evaluate the past performance of subcontractors and determined that she would "evaluate the past performance of the prime and each sub independently and then evaluate that relative value of the combined experience in light of the effort between the parties . . . ." Id.  Ms. Weindel's review of the past performance submittals focused on the size, scope, and complexity of the prime and subcontractors' previous efforts. Id. at 1829-38.

Ms. Weindel reviewed DCMS-ISA's past performance submittals, finding that its past performance under the contracts for bridge replacement, recreation area improvements, and repair to hurricane-damaged work centers were not relevant to the solicitation, but that subcontractor Am-Gard's past performance under the existing contract with FPS and another contract was similar to the effort required by the solicitation in terms of size, scope, and complexity. Id. at 1833-34.  With regard to L&R/ISF's past performance submittals, Ms. Weindel found that only subcontractor C&D, who would only be responsible for approximately twenty-five percent of the effort under the solicitation, had highly relevant past performance.[14] Id. at 1829.  In reviewing Whitestone's past performance submittals, Ms. Weindel found that its past performance

_____

[14]Ms. Weindel also noted that the prime and subcontractors in L&R/ISF's proposal had not demonstrated any past performance as a team.  AR 1829.

-14-

involved security services contracts that were significantly smaller and less complex than

the effort required by the solicitation, because they did not involve traffic control,

physical security, magnetometer and x-ray use, access to sensitive information, or the

training and suitability requirements of the FPS effort. Id. at 1829-30. Ms. Weindel

found that Whitestone's subcontractor, AlliedBarton, did have past performance that was

similar to the proposed award in terms of size, scope, and complexity. Id. In addition,

Ms. Weindel reviewed RDTTS's submittals, finding that RDTTS's past performance

under contracts for radio repair, printer maintenance and support services, and

maintenance services for computer equipment was not relevant. Id. at 1832. Ms.

Weindel found that RDTTS's subcontractor Pond had one past performance reference

similar to the proposed effort in terms of size, scope, and complexity, but that the

magnitude of the effort under Pond's other two past performance references was

significantly smaller and less complex than the proposed FPS contract in that the guards

were unarmed and were not trained and qualified to FPS standards. Id. She also found

that subcontractor HarborSite's past performance references were significantly smaller

and less complex than FPS's requirements. Id. at 1833.

Based upon her review, Ms. Weindel determined that the acquisition strategy for

the solicitation was flawed for a number of reasons. Id. at 1839-40. First, Ms. Weindel

concluded that the solicitation should not have been an SDVOSB set-aside, because the

vast majority of the proposals submitted were teaming arrangements wherein SDVOSBs

with little to no relevant experience teamed with more experienced subcontractors.[15]  Id.

at 1839.  Ms. Weindel noted that the solicitation did not discuss the evaluation of

subcontractor or teaming partner experience and that the past performance of

subcontractors had been assigned to prime contractors with no experience.  Id. at 1840.

Ms. Weindel also found that the TET did not discuss the prime/subcontractor

arrangements in evaluating past performance and that projects "a fraction of the size" of

the one contemplated by the solicitation were considered relevant by the TET, while the

quality of the past performance was not considered.[16]  Id.  Based upon these

considerations, Ms. Weindel found that a competitive range could not be determined

without "starting all over."[17]  Id.

---

[15]Ms. Weindel determined that the SDVOSB offerors which did not propose teaming arrangements also had no relevant past performance.  AR 1839.  Specifically, she found that "[t]he 2 SDVO[S]B's that submitted on their own merit ([CASS] and Veteran Security Services) – should be rated Neutral in P[ast ]P[erformance] – neither of them ha[d] the relevant experience necessary to successfully perform a contract of this magnitude."  Id.  Neither of those offerors is a party in this case.

[16]Ms. Weindel also found that the technical capability factor was unwieldy.  AR 1839. She noted that it consisted of numerous subfactors but that the solicitation did not state that they were subfactors or assign relative importance to them.  Id.  She also found that the TET did not appear to analyze the offerors' strengths and weaknesses in terms of some of the subfactors.  Id. For example, Ms. Weindel found that, in "[m]any cases, the [TET's comment] was 'Transition Plan – they provided one[,]' . . . [w]ithout an analysis of the quality and feasibility, strengths / weaknesses found in that plan."  Id.

[17]Ms. Weindel also referred to the potentially improper discussions with fewer than all offerors in the TET's "competitive range," noting that the offerors with whom W-CCG held discussions did not appear to be among the "most highly rated," AR 1840, and to the potential violation of the PIA, noted supra, although the details of the latter were not before her at the time she made her determination that the solicitation should be canceled.  Id.; Def.'s Mot. at 17 & n.8.

On April 25, 2008, Ms. Weindel briefed the Head of Contracting Activity ("HCA"), the ICE Office of Acquisition Management Small Business Representative, and the DHS Office of Small and Disadvantaged Business Utilization ("DHS OSDBU") on her findings regarding the solicitation. Id. at 1841-43, 1867. Ms. Weindel's briefing notes state that none of the SDVOSB prime contractors had relevant past performance experience of a similar nature, size, scope, dynamic environment and complexity, using a comparable number of personnel with like skills. Id. at 1841. Of particular significance, Ms. Weindel found that, because FAR 52.219-27 requires that at least fifty percent of the cost of personnel for contract performance be spent for employees of the SDVOSB awardee or employees of other SDVOSB concerns, fully attributing the experience of subcontractors to SDVOSB prime contractors with little to no relevant past performance experience posed an "extreme risk" to FPS. Id. In addition, Ms. Weindel concluded that the market research upon which ICE had relied in determining that the solicitation would be an SDVOSB set-aside was flawed. Id. at 1843. Specifically, she stated that "[t]he market research noted the fact that 25 out of the 40 vendors that responded to a Sources Sought notice were SDVO[S]B[s]. The focus should not have been on interest but on capability to perform."[18] Id. (emphasis added). Accordingly, Ms. Weindel concluded that

_____

[18]Ms. Weindel also reiterated her concerns about the TET's capability assessments:

The assessment of these firms' capabilities did not explore (in all cases) the makeup of the entity if it was a teaming arrangement nor did it adequately consider the very large difference in magnitude and complexity of the work which is required under the procurement and the work these firms have experience in.

the solicitation should be canceled and resolicited using a strategy that would result in offers from businesses with the requisite experience to perform a contract of the scope, magnitude, and complexity of the solicitation.  Id.

### D.      Cancellation of the Solicitation

Ms. Weindel prepared a "Determination and Findings, Authority to Cancel Solicitation HSCEQ8-08-R-00004" ("Determination and Findings"), which was signed by Ms. Weindel, Ms. Ferraro, and the HCA on May 2, 2008.  AR 1844-46.  The Determination and Findings identified the "risk" to FPS in proceeding with the procurement, as follows:

> The RFP stated that the Government would evaluate recent past performance for relevance and quality.  An effort would be considered relevant if it was of a similar nature, size, scope, dynamic environment and complexity, utilizing a comparable number of personnel with like skills.  The Past Performance evaluation revealed that none of the offerors demonstrated experience similar to that described above, unless at the subcontract level where teaming arrangement[s] were proposed.  In those cases, the benefit of the subcontractor experience was far outweighed by the risk inherent in awarding a contract to a prime contractor with little to no relevant experience of its own.  As set forth in FAR 52.219-27 "Notice of Total Service Disabled Veteran-owned Small Business Set-Aside", the SDVO[S]B concern must agree that in performance of the contract, ["]at least 50% of the cost of personnel for contract performance will be spent for employees of the concern...".  With this in mind, fully attributing the experience of subcontractors to a prime with little or no experience that is responsible for the majority effort, is an extreme risk to FPS.

AR 1844 (ellipsis in original; emphasis added).  The Determination and Findings further stated that:

---

AR 1843.

> Based on the evaluation of offers received, the CCG concluded that the SDVOB community does not demonstrate the necessary relevant experience to perform a requirement such as this without significant risk to the agency and without an excessive reliance on established, large, security firms acting as subcontractors.  The rationale supporting this conclusion was briefed to the DHS [OSDBU] on 25 April 08.  The DHS OSDBU concurred with the CCG's conclusion.  In accordance with FAR 19.1405(c)[, 48 C.F.R. § 19.1405(c) (2006)], and as recommended by the DHS OSDBU, the SDVOSB set-aside shall be withdrawn and set aside for small business concerns, as and if appropriate.

AR 1844-45.

On May 20, 2008, DHS issued Amendment No. 0003, canceling the solicitation "because no offeror possessed relevant past performance."  Id. at 1866.  Amendment No. 0003 further explained that:

> [t]he highest magnitude of any past guard service effort submitted for review with performance accomplished by a prime contractor was $ 5.0 million per year, while the estimate for this requirement is $9.5[] million per year.  The Government determined that the performance risk was too high from all offers received.  In order to increase competition among contractors with an acceptable level of performance risk, the requirements will be met by issuing a task order under the GSA schedule contract.

Id. (emphasis added).

### E.    The New Solicitation

In May 2008, prior to canceling the solicitation, FPS conducted market research to determine the availability of capable sources and the viability of a small business set-aside for the resolicitation.  AR 1852.  Based on this research, FPS determined that the new solicitation would be awarded under Federal Supply Schedules and would include a "socio-economic factor targeting small businesses," which would be "assigned more

importance" than any other evaluation factor.  Id. at 1849, 1852, 1858, 1871.  On May 13,

2008, the SBA Procurement Center signed off on the acquisition strategy for the new

solicitation.  Id. at 1851.

On June 12, 2008, FPS issued a request for quotes to solicit General Services

Administration ("GSA") Schedule contract holders for purposes of awarding a Blanket

Purchase Agreement for security guard services in the Denver, Colorado area.  Id. at

1870.  With regard to past performance, the new solicitation stated:

> Where prime/sub contractor teaming arrangements are quoted, relevant past
> performance shall be demonstrable at the prime contractor level.  The
> government may evaluate the past performance of the managers, key
> personnel, subcontractors or other partners separately from that of the prime
> contractor/quoter as an entity.  In such cases, the government will assess
> whether or how the past performance of managers, key personnel,
> subcontractors or other partners offsets any risk of doing business with a prime
> contractor (quoter) with limited or no experience and past performance of its
> own.

Id. at 1872 (emphasis added).  Quotes under the new solicitation were due July 14, 2008.

Id. at 1870.

## F.    The Present Litigation

The plaintiffs filed their "pre-award bid protest" complaint in this court on June

20, 2008, claiming that the agency's decision to cancel the original solicitation on the

grounds that none of the SDVOSB offerors had relevant past performance was arbitrary,

capricious, and not in accordance with the FAR or the solicitation terms.  Compl. ¶ 1;

Am. Compl. ¶ 10.  The plaintiffs seek injunctive relief directing "DHS to review the

SDVOSB[s'] proposals in accordance with the requirements of the [canceled] SOLICITATION and existing law and award to one of the SDVOSB[]s submitting a proposal."[19]  Am. Compl. at 5.  On July 21, 2008, the plaintiffs filed their motions for judgment on the administrative record and for an order directing the government to refer the SDVOSB proposers to the SBA for a COC.  In the latter motion, the plaintiffs argued that DHS lacked the authority to reject the bids based on the past performance of the offerors because those rejections constituted "responsibility determinations" which could only be made by the SBA.  On August 22, 2008, the government filed a cross-motion for judgment on the administrative record, asserting that the agency was entitled to cancel the solicitation on the grounds that it did not result in proposals that best met its needs in terms of relevant past performance of prime offerors.  Oral argument was heard on September 25, 2008, and supplemental briefing was completed on September 29, 2008.

## II.    STANDARDS OF REVIEW

### A.    Bid Protest Jurisdiction

The United States Court of Federal Claims has jurisdiction to adjudicate pre- and post-award bid protest claims pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000), which provides this court with

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged

---

[19]The plaintiffs also seek costs and attorneys' fees, as well as "such other and further relief as this Court may deem just and proper."  Am. Compl. at 5.

violation of statute or regulation in connection with a procurement or a
proposed procurement[,] . . . without regard to whether suit is instituted before
or after the contract is awarded.

28 U.S.C. § 1491(b)(1); see also, e.g., Impresa Construzioni Geom. Domenici Garufi v.

United States, 238 F.3d 1324, 1330 (Fed. Cir. 2001). The United States Court of Appeals

for the Federal Circuit has held that "the proper standard to be applied in bid protest cases

is provided by [the Administrative Procedure Act ('APA'),] 5 U.S.C. § 706(2)(A)

[(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of

Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (quoting 5 U.S.C. §

706(2)(A); citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58

(Fed. Cir. 2000)); 28 U.S.C. § 1491(b)(4) (2000); see also Int'l Res. Recovery, Inc. v.

United States, 60 Fed. Cl. 428, 431 (2004) ("'While a disappointed bidder does not have

the right to have a federal court substitute its judgment for that of the administrative

agency, the bidder does have the right to introduce appropriate evidence to allow the court

to determine whether the agency action was arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law.'" (quoting GraphicData, LLC v. United States,

37 Fed. Cl. 771, 780 (1997))). Under the APA standards, a procurement decision "may

be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2)

the procurement procedure involved a violation of regulation or procedure."[20] Impresa,

---

[20]For reasons that are not entirely clear, the government contends that, absent the
violation of a statute or regulation in connection with the cancellation, this court lacks

238 F.3d at 1332.  If the challenge is "based on alleged violations of 'regulation or procedure,' a claimant must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  Galen Med. Assocs. v. United States, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting Banknote, 365 F.3d at 1351).  To establish prejudice, a protester "must show that there was a 'substantial chance' it would have received the contract award but for the errors" alleged.  Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citations omitted).

---

jurisdiction to consider the plaintiffs' claims that the cancellation of the solicitation lacked a rational basis.  The government argues that under 28 U.S.C. § 1491(b)(1), this court only has jurisdiction to adjudicate bid protest claims objecting to at least one of the following: (1) the solicitation, (2) a proposed award, (3) an award, or (4) an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  See 28 U.S.C. § 1491(b)(1) (granting jurisdiction over "objecti[ons] to a solicitation by a Federal Agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement" (emphasis added)).  Citing no support other than the statute, the government argues that, because an objection to the cancellation of a solicitation is not an objection to (1) the solicitation, (2) a proposed award, or (3) an award, absent the violation of a statute or regulation in connection with the cancellation, this court lacks jurisdiction to consider the plaintiffs' claims that the cancellation lacked a rational basis.

The court presumes that the government, in raising this argument, is attempting to contrast the cancellation standard for negotiated procurements in FAR Part 15 with that for sealed bidding, for which FAR Part 14 sets forth more detailed regulatory standards.  While the court acknowledges that the regulatory standards for cancellation in the sealed bidding context are more detailed than those for negotiated procurements, cancellation of a negotiated procurement is nonetheless not immune from rational basis review.  To the contrary, as discussed in detail infra, the government may not, in the context of the applicable standards in connection with the cancellation, act arbitrarily and capriciously.  Because an analysis of the rationality of the agency's decision in this case is encapsulated within the court's review of the government's compliance with the applicable regulatory standards, the court does not have occasion to reach the question of whether, outside of the context of any statutory or regulatory violations alleged, the agency's decision was irrational.  Accordingly, the court does not reach the question of whether it would have jurisdiction over such a stand-alone rationality claim in reviewing the cancellation of a negotiated procurement.

B.     Cancellation Standards

In a negotiated procurement, the contracting agency's decision to cancel a

solicitation is governed by FAR 15.305(b), 48 C.F.R. § 15.305(b) (2005), which states in

its entirety: "The source selection authority ['SSA'] may reject all proposals received in

response to a solicitation, if doing so is in the best interest of the government." (emphasis

added).  Although the FAR does not provide details regarding the application of the "best

interest" standard, this court has found that "the cancellation of an RFP is . . . given a

great degree of discretion, especially where . . . the solicitation explicitly permits the

agency to make no award at all."  Cygnus Corp. v. United States, 72 Fed. Cl. 380, 385

(2006) (citing a clause in the solicitation to the effect that "[t]he Government may reject

any or all proposals if such action is in the Government's interest"); see also Keco Indus.,

Inc. v. United States, 492 F.2d 1200, 1205 (Ct. Cl. 1977) ("[T]here is no assurance that

any bidder would have obtained the award since the Government retains, in its discretion,

the right to reject all bids without any liability.").  "Given the great degree of discretion

afforded [an agency] in its decision to cancel [an] RFP," this court has held that it "must

merely find that the 'agency provide[d] a coherent and reasonable explanation of its

exercise of discretion.'"[21]  Cygnus Corp., 72 Fed. Cl. at 385 (quoting Impresa, 238 F.3d at

---

[21]In addition, the agency's explanation for its decision to cancel may not be "merely a
pretense" for another, improper motivation for canceling, including those "'reflecting personal
predilections of administrative officials, whether ascribable to whim, misplaced zeal, or
impermissible influence,'" such as to avoid contracting with a particular bidder.  126 Northpoint
Plaza Ltd. P'ship v. United States, 34 Fed. Cl. 105, 111-12 (1995) (quoting Parcel 49 Ltd. P'ship
v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)).

1332) ("The APA requires the agency to consider all relevant factors and articulate 'a rational connection between the facts found and the choice made,' hardly an onerous burden." (quoting Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 358 (2004))).

In contrast to sealed bidding, in a negotiated procurement such as the one at issue here, General Accounting Office ("GAO") decisions have found that "the contracting officer need only have a reasonable basis for cancellation after receipt of proposals, as opposed to the 'cogent and compelling' reason required for cancellation of a solicitation after sealed bids have been opened[,] . . . because in sealed bidding competitive positions are publicly exposed as a result of the public opening of bids, while in negotiated procurements there is no public opening." Cantu Servs., Inc., B-219998.9, 1989 WL 240549, *1 (Comp. Gen. 1989) (citing Cadre Technical, Inc., et al., B-221430 et al., 1986 WL 63252 (Comp. Gen. 1986); Allied Repair Serv., Inc., B-207629, 1982 WL 26715 (Comp. Gen. 1982)); see also Steven W. Feldman, Government Contract Guidebook § 6:8 (4th ed. Jan. 2008) ("Generally, the cancellation of an RFP is difficult to challenge because cancellation is a matter of Contracting Officer discretion.  Unlike rejection of all

_____

By the same token, the government may not act in bad faith in canceling a solicitation. See CCL Serv. Corp. v. United States, 43 Fed. Cl. 680, 688 (1999).  However, a "presumption that government officials act in good faith" applies, Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002), and in order to overcome that presumption, "'the proof must be almost irrefragable.'" Galen Med. Assocs., 369 F.3d at 1330 (quoting Info. Tech. Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003)) ("'[A]lmost irrefragable proof' amounts to 'clear and convincing evidence.'" (quoting Am-Pro Protective Agency, 281 F.3d at 1239-40)).

bids after bid opening in a sealed bid procurement, offers in a negotiated procurement have not been publicly exposed.  For this reason, no requirement exists for a compelling reason to justify RFP cancellation as opposed to an [Invitation for Bids] cancellation." (footnotes omitted)).

## III.   DISCUSSION

### A.   Positions of the Parties

In its motion for judgment on the administrative record, the government asserts that the plaintiffs have failed to identify any statute or regulation that required FPS to continue evaluating proposals once it determined that the acquisition strategy was flawed and the solicitation should be canceled.  To the contrary, the government argues, the agency acted in accordance with its obligations under the FAR and the solicitation when it canceled the solicitation.  As noted above, the government argues that, absent such a violation of an applicable statute or regulation, the court lacks jurisdiction over the plaintiffs' claims that the cancellation lacked a rational basis.  However, the government argues that, to the extent that the court finds that it has jurisdiction to consider the plaintiffs' "lack of rational basis" claims, FPS's decision to cancel the solicitation in spite of the TET's findings was rational, in light of Ms. Weindel's authority as the SSA and her determination that the TET had failed to discuss or consider the SDVOSB offerors' past performance separately from that of the subcontractors in their teaming arrangements.

The plaintiffs, by contrast, list a number of actions they allege the agency was

required but failed to take instead of deciding to cancel the solicitation.  In essence, the

plaintiffs argue that the agency short-circuited the proposal evaluation and award process

they allege was required by the solicitation and the FAR.  For instance, the plaintiffs

allege that, unlike the TET, Ms. Weindel failed to evaluate or consider the proposals on

the basis of the technical capability factor, nor did she perform an integrated assessment

and trade-off analysis, as set forth in the solicitation.  They allege that Ms. Weindel

improperly ignored the TET's finding that many of the proposals demonstrated "Very

Good" or "Satisfactory" past performance, the TET's "Best Value" determination

selecting L&R/ISF, and the TET's lack of finding of any "risk" to FPS in proceeding with

the award; they further allege that Ms. Weindel failed to properly define or explain what

was meant by the "risk" she found to the FPS in proceeding with the solicitation.[22]

The plaintiffs also argue that, rather than giving a neutral evaluation to the offerors

with no record of relevant past performance experience, Ms. Weindel's decision to reject

all bids and cancel the solicitation effectively rated those offerors unfavorably, in

violation of FAR 15.305(a)(2)(iv), 48 C.F.R. § 15.305(a)(2)(iv) (2005), and the terms of

the solicitation.  They allege that Ms. Weindel penalized the plaintiffs for entering into

teaming agreements, which were encouraged by the FAR and allowed by the solicitation.

The plaintiffs do not take issue with Ms. Weindel's conclusion that, looking at the past

---

[22]In addition, the plaintiffs argue that, to the extent that Ms. Weindel's evaluation
contradicted the findings of the TET, Ms. Weindel's findings were irrational and arbitrary,
representing the "myopic analysis" of just one individual.  See Pls.' Mot. JAR at 9 ¶ 37, 11 ¶ 53,
20, 21.

performance of the primes alone, none of the plaintiffs had sufficient past experience by

themselves; instead, they argue, without citing to any supporting authority, that "[i]t is

clear and unassailable that in considering the relevance of past performance of each

proposer <u>the entire team must be considered not an individual member</u> . . . ."[23]  Pls.' Mot.

---

[23]The plaintiffs do argue that even under Ms. Weindel's analysis, considering only the experience of the SDVOSB primes, at least one SDVOSB should have survived.  <u>See</u> FAR 19.1405(c) ("If the contracting officer receives only one acceptable offer from a[n SDVOSB] concern in response to a set-aside, the contracting officer should make an award to that concern.").  In support of this contention, the plaintiffs point to the reference in the cancellation decision (Amendment No. 0003) to an SDVOSB proposer that had submitted a "$ 5.0 million per year" guard service effort as past performance for the estimated "$9.5[] million per year" for this award, arguing that, "[i]f the SDVOSB is compelled to perform 50% of the effort and $5.0 million is more tha[n] 50% of [$]9.5 million[,] the 'effort' [of the company with that experience] is relevant." Pls.' Mot. JAR at 10 ¶ 45, 20.

The plaintiffs do not identify any specific SDVOSB prime to whom they assert that the "$ 5.0 million per year" reference in Amendment No. 0003 pertains, and they do not assert that it refers to one of the plaintiffs.  The court notes that the only $5,000,000 per year contract submitted by an SDVOSB prime (as identified by Ms. Weindel in her "Notes Taken During Review of Offeror Past Performance Submittals to Determine Experience of Quoters to Include Prime and Subs," AR 1829-38) was submitted by Security Alliance, which is not a plaintiff in this action.  AR 1836-37 (describing a "$5MIL year" contract for "unarmed store security" at "Rooms to Go Furniture" as having "no relevance" and rating its scope and complexity as "[n]ot similar" to the proposed contract).  Because none of the plaintiffs in this action has standing to bring a claim on behalf of Security Alliance, and no other $5,000,000 contract submitted by an SDVOSB prime has been identified by the plaintiffs, the court does not reach the plaintiffs' claim that the submitter of such a contract should have survived Ms. Weindel's analysis.

At oral argument, the plaintiffs also pointed to Ms. Weindel's statement "assign[ing] a rating of 'Satisfactory' for ISF Past Performance," AR 1829, as evidence that L&R/ISF's proposal should have been acceptable even under Ms. Weindel's review.  <u>See</u> FAR 19.1405(c). However, in her review, Ms. Weindel went on to list reasons why "[a] fair amount of doubt exist[ed]" that L&R/ISF could "successfully perform the required effort." AR 1829.  Ms. Weindel noted that "the prime, who is responsible for 50% of personnel costs in performance in the contract, demonstrated a high quality performance but it was considered to be low relevance," "the only highly relevant contract is held by the subcontractor C&D who will be responsible for only 25% of the effort," and "the second sub's experience is considered low relevancy and no information could be gathered about the quality of its performance." <u>Id.</u>  Accordingly, L&R/ISF, like the other offerors, was found by Ms. Weindel to lack the "necessary relevant experience to perform a requirement such as this without significant risk to the agency and without an

JAR at 20 (emphasis added); Pls.' Reply to Mot. JAR at 8 (same).  The plaintiffs further

argue that because FAR 52.219-27 requires only that fifty-one percent of the personnel

costs for contract performance be spent for the SDVOSB employees, and the regulation

says nothing about relying on the past performance of the SDVOSB separately from the

teaming arrangement, the agency's reliance on FAR 52.219-27 in deciding to cancel was

not rational.  Finally, the plaintiffs argue that the agency did not give the offerors an

opportunity to discuss or clarify their past performance information, although that

information was the determining factor preventing them from being placed in the

competitive range, which the plaintiffs claim was a violation of FAR 15.308, 48 C.F.R. §

15.308 (2005).

### B.    Analysis

The court finds that the plaintiffs have failed to demonstrate that the agency

violated any statute or regulation or acted arbitrarily, capriciously, or without a rational

basis in connection with its decision to cancel the solicitation after the agency determined

that the acquisition strategy had failed to result in proposals that met the government's

needs for the project.  To the contrary, the court finds that the agency's actions conformed

with its obligations under the FAR in connection with cancellations of solicitations

involving SDVOSBs.

Specifically, as noted above, FAR 15.305(b) provides that "[t]he [SSA] may reject

---

excessive reliance on established, large, security firms acting as subcontractors."  Id. at 1844
(Determination and Findings).

all proposals received in response to a solicitation, if doing so is in the <u>best interest of the</u>

<u>Government</u>." (emphasis added).  Accordingly, cancellation of a solicitation in a

negotiated procurement is "given a great degree of discretion, especially where, as in this

case, the solicitation explicitly permits the agency to make no award at all."  <u>Cygnus</u>

<u>Corp.</u>, 72 Fed. Cl. at 385; <u>see also</u> <u>Keco</u>, 492 F.2d at 1205.  In this case, the solicitation

expressly and repeatedly advised proposers that "this [RFP] in no manner obligates the

Government regarding award of a contract, task order or modification that results from

the issuance of this RFP."  AR 7, 170-G.  Accordingly, where, as here, the agency

"provide[d] a coherent and reasonable explanation of its exercise of discretion," <u>Cygnus</u>

<u>Corp.</u>, 72 Fed. Cl. at 385 (<u>quoting</u> <u>Impresa</u>, 238 F.3d at 1332), articulating "a rational

connection between the facts found and the choice made," the cancellation decision must

be found to have been proper.  <u>Id.</u> (<u>quoting</u> <u>Great Lakes</u>, 60 Fed. Cl. at 358).

In this case, Ms. Weindel, as the SSA, determined that cancellation of the

solicitation would be in the best interest of FPS because the acquisition strategy failed to

elicit any SDVOSB prime contractors with relevant past performance.  In its

Determination and Findings, FPS explained that, given the requirement in FAR 52.219-27

that an SDVOSB concern "must agree that in performance of the contract, at least 50% of

the cost of personnel for contract performance will be spent for employees of the

concern[,] . . . <u>fully attributing the experience of subcontractors to a prime with little or no</u>

<u>experience that is responsible for the majority effort, is an extreme risk to FPS</u>."  AR

1844 (emphasis added).  In light of the discretion given to cancellation decisions in

negotiated procurements, as set forth above, see FAR 15.305(b); Cygnus Corp., 72 Fed.

Cl. at 385, the court finds that it was not irrational for FPS to decide that it was necessary

for the SDVOSB prime contractors in this case to demonstrate that they would be able to

shoulder the responsibilities of this large, complex security contract by submitting their

own relevant past performance.  As the government correctly notes, FAR 9.604(e), 48

C.F.R. § 9.604(e) (2004), provides that the government may "[h]old the prime contractor

fully responsible for contract performance, regardless of any team arrangement between

the prime contractor and its subcontractors."[24]  Given that the SDVOSB primes were to

be the ultimate guarantors of performance of the contract, it was not irrational for the

government to decide that it was too risky to depend on SDVOSB primes with no relevant

past performance to be in charge of the contract, nor was it irrational to conclude that the

solicitation should be canceled on that basis.[25]

This conclusion is reinforced by various GAO decisions in which the GAO has

rejected protests from small business offerors on the grounds that they did not have

sufficient past experience without relying on subcontractors and held that it was

---

[24]Moreover, the solicitation itself indicated that the past performance evaluation was to
provide "a measure of the Government's confidence in the offeror's ability to successfully
perform based on previous and current contract and/or task order efforts."  AR 183, 195.

[25]The plaintiffs have not alleged nor have they put forth any evidence to support a claim
that the agency's explanation was in any way a mere pretense for an inappropriate motivation for
canceling the solicitation, see 126 Northpoint Plaza Ltd. P'ship, 34 Fed. Cl. at 111-12, nor have
they alleged bad faith on the part of the agency.  See CCL Serv. Corp., 43 Fed. Cl. at 688.

reasonable to conclude that the primes themselves must have adequate relevant

experience.  See North State Res., B-282140, 1999 WL 812500 (Comp. Gen. 1999);

USATREX Int'l, Inc., B- 275592, 1997 WL 868302 (Comp. Gen. 1997); Innovative Tech.

Sys., Inc., B-260074, 1995 WL 317615 (Comp. Gen. 1995).  For example, in Innovative,

the GAO determined that the United States Department of the Navy was "clearly

reasonable" in deciding that

> an offeror under a services contract may not rely entirely on its subcontractor's
> experience when, given the restriction on subcontractor participation in
> performance of the contract under FAR § 52.219-14[, 48 C.F.R. § 52.219-14
> (2006)],[26] the offeror itself will be required to expend at least 50 percent of the
> labor costs under the contract for its own employees.

Innovative, 1995 WL 317615 at *5 (emphasis added).  The GAO in Innovative continued,

> Even without regard to FAR § 52.219-14, where, as here, the procuring agency
> is requiring the successful offeror to operate and maintain a computer network,
> and  otherwise assume ultimate responsibility for the management and
> performance of an entire computer system, we think it is reasonable for the
> agency to require the successful offeror to possess its own, in-house corporate
> experience instead of relying on its subcontractor's experience to prove its
> ability under a corporate experience technical factor.

Id. (emphasis added).  Accordingly, just as this court now finds in the SDVOSB context

in the instant case, the GAO has found that it is not unreasonable for an agency to

conclude, given the requirements of the FAR regarding personnel costs under small

business set-asides, that prime contractors must demonstrate relevant past performance of

their own.  Id.; see also North State Res., 1999 WL 812500 at *5 ("[A]n agency need not

---

[26]FAR 52.219-14 contains requirements for SBA 8(a) set-asides analogous to those for
SDVOSB set-asides contained in FAR 52.219-27, the provision cited by the FPS in this case.

consider subcontractor experience where the solicitation contemplates award of a service contract to a section 8(a) firm, and includes the provision at [FAR] 52.219-14 . . . .  In such cases, the agency properly may determine that only the offerors['] own capabilities are relevant for purposes of discriminating among the proposals. . . . [The agency] properly could limit its evaluation to the prime contractors['] capabilities." (emphasis added) (citing USATREX, 1997 WL 868302)).

The fact that the TET arrived at a different conclusion does not change the analysis.  The agency found that the TET did not consider a factor (relevant experience of the SDVOSB primes) which the agency determined was crucial to meeting its goals for the SDVOSB set-aside, justifying the agency's decision not to rely on the TET's findings. Specifically, Ms. Weindel determined that the TET's evaluation of the proposals did not take into account the prime/subcontractor arrangements in evaluating past performance, AR 1840, and accordingly, when applying that different criterion to each of the proposals, Ms. Weindel came to different conclusions than those reached by the TET.  See id. 1829-38, 1841-43.  Ms. Weindel's authority to negate the TET's findings is fully supported by FAR 15.308, which states: "While the [SSA] may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment." (emphasis added).  This court has held that FAR 15.308 "permits the SSA to test and disagree with the evaluators' conclusions."  L-3 Commc'ns Integrated Sys. v. United States, 79 Fed. Cl. 453, 462 (2007) ("'Source selection officials are not bound by the

recommendations of lower-level evaluators, and as a general rule, we will not object to

the higher-level official's judgment, absent unreasonable or improper action, even when

the official disagrees with an assessment made by a working-level evaluation board or

individuals who normally may be expected to have the technical expertise required for

such evaluations.'" (quoting Speedy Food Serv. Inc., B-258537, 1995 WL 317603

(Comp. Gen. 1995))).  Accordingly, Ms. Weindel as the SSA was well within her

authority to exercise her independent judgment and disagree with the TET's conclusions.

In addition, in the case of SDVOSB set-asides in particular, the FAR provides that,

"[i]f the contracting officer receives no acceptable offers from [SDVOSB] concerns, the

[SDVOSB] set-aside shall be withdrawn and the requirement, if still valid, set aside for

small business concerns, as appropriate."  FAR 19.1405(c) (emphasis added).  Here, Ms.

Weindel determined that no offers were received from SDVOSB prime contractors with

relevant past performance, and based on that lack of acceptable offers from SDVOSB

concerns, she determined that the solicitation should be withdrawn and resolicited using a

different acquisition strategy, designed to give small businesses a competitive advantage.

As such, her decision to withdraw the SDVOSB set-aside was in compliance with FAR

19.1405(c).

Ms. Weindel's actions also conformed with FAR 15.206(e), 48 C.F.R. § 15.206(e)

(2005), which provides:

If, in the judgment of the contracting officer, based on market research or
otherwise, an amendment proposed for issuance after offers have been

> received is <u>so substantial</u> as to exceed what prospective offerors reasonably
> could have anticipated, so that additional sources likely would have submitted
> offers had the substance of the amendment been known to them, <u>the</u>
> <u>contracting officer shall cancel the original solicitation and issue a new one,</u>
> <u>regardless of the stage of the acquisition</u>.

(emphasis added).  In this case, Ms. Weindel concluded that the solicitation as written did

not succeed in eliciting proposals from SDVOSB concerns with relevant past

performance, despite the Q&As referring proposers to the FAR provisions regarding

SDVOSB ownership and personnel costs, and that awarding to an SDVOSB concern

without relevant experience posed an unacceptable risk to the government.  As noted

above, since none of the SDVOSB offerors were deemed acceptable, FAR 19.1405(c)

required the agency to withdraw the SDVOSB set-aside status.  The agency's

Determination and Findings found that changing the set-aside status of the solicitation

would "drastically change the requirement in terms of acquisition strategy," and therefore,

"[i]n accordance with FAR 15.206(e)," "cancellation and re-issuance of the solicitation

[was] appropriate."  AR 1845.  Expanding the solicitation to include concerns other than

SDVOSBs involved a change "so substantial" that additional sources most certainly

would have submitted offers, as contemplated by FAR 15.206(e).[27]  Accordingly, the

---

[27]In addition, the agency's stated rationale in its cancellation decision (Amendment No.
0003) included the following: "<u>In order to increase competition among contractors with an</u>
<u>acceptable level of performance risk</u>, the requirements will be met by issuing a task order under
the GSA schedule contract."  AR 1866 (emphasis added).  The court notes that cancellation and
re-solicitation based on the possibility of increased competition has been found to be reasonable.
<u>See, e.g.</u>, <u>VSE Corporation</u>, B-290452.2, 2005 WL 1396999, *5 (Comp. Gen. 2005) ("[W]e find
that the agency[']s assumption that additional firms may well be interested in participating in a
competition based on a solicitation reflecting the agency[']s current requirement, with the result

agency's decision to cancel the solicitation and open the project to concerns other than

SDVOSBs rather than simply amending it was appropriate under FAR 15.206(e).[28]

Thus, the court finds that the government was within its rights to cancel the

solicitation and resolicit using a different acquisition strategy once it determined that the

original solicitation had failed to result in any proposals that met the agency's needs.

Where, as here, the government is entitled to a great degree of deference, the court will

not force the government to accept the services of contractors that the government has

determined will not meet its needs.  Where the government has made such a

determination, it must be allowed to call an end to a negotiated solicitation, rather than

being required to push forward and select an awardee.

The plaintiffs have not pointed to any statute, regulation, or provision of the

solicitation requiring the agency to go through a longer process before arriving at its

decision to cancel;[29] to the contrary, as noted above, the regulations pertaining to

---

that competition may be increased, is reasonable."); G.K.S. Inc., B-235208, 1989 WL 237516, *2 (Comp. Gen. 1989) ("[A] procuring agency may cancel a negotiated procurement based on the potential for increased competition or cost savings.").

[28]The court notes that the appropriateness of the cancellation is underscored by the deferential language in FAR 15.206(e), which directs that the decision whether to amend or cancel be made "in the judgment of the contracting officer, based on market research or otherwise."  FAR 15.206(e) (emphasis added).

[29]For example, the plaintiffs' argument, as set forth in their motion to refer to the SBA, that Ms. Weindel's evaluation of the past performance of the offerors was a responsibility determination of a type requiring referral to the SBA for a COC rather than canceling the solicitation on the grounds that none of the SDVOSB primes demonstrated relevant past performance is unavailing.  FAR Subpart 9.1 governs the determination of "whether prospective contractors and subcontractors are responsible."  FAR 9.100, 48 C.F.R. § 9.100 (2004).  FAR

cancellation of a negotiated procurement expressly allow for cancellation "regardless of the stage of the acquisition." FAR 15.206(e). Moreover, having concluded that the cancellation of the solicitation was not improper, the court has no occasion to reach the plaintiffs' arguments that the agency should have taken additional or different steps in evaluating the proposals – the proper cancellation essentially mooted those claims. See CCL Serv. Corp., 43 Fed. Cl. at 690 ("In light of [the agency's] decision to cancel the solicitation, any decision on the merits of the award would not affect plaintiffs in any respect – none of the plaintiffs will be eligible for award, as no award can be made under

---

9.104-3(d)(1), 48 C.F.R. § 9.104-3(d)(1) (2004), provides that "[i]f a small business concern's offer that would otherwise be accepted is to be rejected because of a determination of nonresponsibility, the contracting officer shall refer the matter to the [SBA], which will decide whether or not to issue a [COC] (see [FAR] Subpart 19.6)." (emphasis added). FAR 19.601(c), 48 C.F.R. § 19.601(c) (2006), in turn, states that "[a] contracting officer shall, upon determining an apparent successful business offeror to be nonresponsible, refer that small business to the SBA for a possible COC . . . ." (emphasis added).

In this case, however, no small business concern's offer was selected as an "apparent successful business offeror," FAR 19.601(c), notwithstanding the fact that the TET identified an offeror (L&R/ISF) which it considered to represent the "best value" to the government. Instead of selecting an apparent awardee, Ms. Weindel determined that the TET's analysis of all of the offerors had been flawed in that it failed to properly analyze the past performance data submitted by the offerors. Upon re-analyzing the past performance data, she found – not that L&R/ISF was not responsible in spite of being the apparent successful offeror (which would have required referral to the SBA under FAR 19.601(c)) – but that none of the offerors possessed relevant past performance on the part of the SDVOSB primes and all bids should be rejected. The DHS OSDBU supported the decision to withdraw the SDVOSB set-aside and resolicit, AR 1844-45, and the SBA Procurement Center signed off on the acquisition strategy for the new solicitation. AR 1851. As discussed supra, Ms. Weindel had the authority to "reject all proposals received in response to [the] solicitation, if doing so [was] in the best interest of the Government." FAR 15.305(b). Nothing in the FAR – including the rules regarding responsibility determinations and the issuance of COCs by the SBA – prevented her from doing so on the basis that it was not in the government's best interest to proceed with the solicitation when none of the SDVOSBs had demonstrated relevant past performance. Accordingly, the plaintiffs' motion to refer this matter to the SBA is **DENIED** as moot.

a canceled solicitation.  The mere fact that plaintiffs may have been entitled to more relief

than they received had there been a decision on the merits is insufficient to permit

continued litigation in light of [the agency's] actions, which have rendered the underlying

issue moot."  Thus, the agency "has precluded the court from making a finding regarding

the . . . question" of "whether error occurred in the procurement process[.]"); see also

S.K.J. & Assocs., Inc. v. United States, 67 Fed. Cl. 218, 228 (2005) (finding "no matter

before the court for resolution upon which [the plaintiff could] base its claim for bid

preparation and proposal costs" arising out of the agency's "failure to evaluate [the

plaintiff's] original bid properly," "because the original contract and solicitation at issue .

. . were cancelled," and declaring the claim moot on that basis).  Stated another way, the

violations alleged by the plaintiffs to the effect that the proper procedures for evaluating

proposals were improperly short-circuited would only have been reviewable if there had

not been an intervening, proper cancellation in this case.

## IV.    CONCLUSION

For the foregoing reasons, the government's motion for judgment on the

administrative record is **GRANTED**, and the plaintiffs' motions for judgment on the

administrative record and to refer to the SBA are both **DENIED**.  Accordingly, the clerk

is instructed to enter judgment in favor of the government.  No costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge